# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JOHN YOUNG,

       Plaintiff,

v.                                     CV 11-0478 WPL

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER

John Young filed applications with the Social Security Administration ("SSA") alleging that degenerative disc disease and resulting pain rendered him unable to work beginning in July of 2008.[1] (Administrative Record ("AR") 10, 12-13.) The Commissioner of Social Security denied his applications after several rounds of review (AR1-3, 7-9, 48-51), and Young's appeal from that decision brought the case before me. Young has filed a Motion to Reverse or Remand (Doc. 23) and a Memorandum in Support (Doc. 24), and the Commissioner has responded (Doc. 25). Young chose not to reply; instead, he filed a Notice of Completion of Briefing. (Doc. 26.) Pursuant to 28 U.S.C § 636(c)(1) and FED. R. CIV. P. 73, the parties consented to have me serve as the presiding judge and enter final judgment. After having read and carefully considered the record, pleadings, and relevant law, I find that the Administrative Law Judge ("ALJ") committed legal error at step five. I therefore order that the Commissioner's decision be reversed and remanded.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial

---

[1] Amended alleged onset date. *See infra* p. 3.

evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See id.* (quotation omitted). My review is limited to the arguments raised by the claimant. *Marshall v. Chater*, 75 F.3d 1421, 1426-27 (10th Cir. 1996) (citations omitted).

### SEQUENTIAL EVALUATION PROCESS

The Social Security Administration ("SSA") has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall*, 561 F.3d at 1051-52; 20 C.F.R. §§ 404.1520, 416.920. If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, he is capable of performing other jobs existing in significant numbers in the national

economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Young is a forty year old man with an eleventh grade education who worked from 2005 through June of 2008 as a janitor and supervisor. (*See* AR 41, 187.) He also has a work history in various janitorial, landscaping, and stocking jobs from 1993 through 2004. (AR 187.) Young alleges that he is disabled due to lower back pain that radiates into his legs. (*See* AR 144.) Though he initially claimed that his disability rendered him unable to work beginning April 1, 2007, he amended his alleged onset date to July 1, 2008 during the hearing before the ALJ. (AR 10, 27, 100, 109.)

Young has received all medical care of record at the outpatient clinics of the University of New Mexico Hospitals. The relevant records begin in September of 2007, when Young went to the Family Practice Clinic and advised that he had been experiencing chronic back pain for two years. (AR 219.) He informed the doctor that his pain could only be controlled with narcotic medications that he obtained from his mother. (*Id.*) The examining physician found that his "story is not consistent with physical exam" after finding a negative straight leg raise,[2] full strength, and no muscle atrophy. (AR 220.) The physician referred him to physical therapy and wrote a prescription for a non-narcotic pain reliever, a decision with which Young "was not happy[.]" (*Id.*)

He was scheduled for a follow-up in six weeks (*id.*), but he returned to the clinic two weeks later complaining that his pain had not improved with the prior prescription and stating that nothing

---

[2] Limitation in straight leg raising (a positive test result) is indicative of a low back condition that affects spinal nerve roots and the sciatic nerve. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1363 (16th ed. 1996).

helped except Vicodin or Percocet. (AR 216.) He did not appear to be in acute distress, both straight and cross leg tests were negative, and there was no decrease in range of motion. (*Id.*) An initial x-ray was normal, but not all views were available, so the doctor prescribed a muscle relaxant and a pain reliever. (AR 217.)

Testing including an x-ray and an MRI eventually revealed advanced degenerative disk changes at L5 and S1. (AR 213, 233.) Specifically, the MRI completed on December 28, 2007 found "[d]egenerative disk disease at T11-12, L4-5, and L5-S1. The most significant level (L5-S1) demonstrates modic type 1 degenerative endplate signal changes, and disk disease at this level may impinge on the traversing right S1 nerve root." (AR 236.)

Beginning in October of 2007, after his x-ray results were reviewed, the Family Practice Clinic began to prescribe Vicodin, a narcotic, for pain relief. (AR 213-14.) Young continued to have good examinations, with negative straight and cross leg tests and full to almost full strength in his lower extremities. (AR 213 (October 8, 2007 examination), 204 (February 11, 2008 examination), 197-98 (April 9, 2008 examination).) However, he continued to report that the Vicodin was insufficient to relieve his pain, taking three to four pills a day rather than two, which caused him to run out of his medications early on December 5, 2007. (AR 209.) His strength in his lower extremities was reduced at an examination on January 24, 2008, and additional pain medications were prescribed including Indocin SR, gabapentin, and Percocet. (AR 207.) Until February 11, 2008, Young did not have a narcotic contract even though he was taking narcotic medications. He and a Family Practice Clinic doctor discussed and signed a narcotic contract that day. (AR 204.)

On February 13, 2008, Young began treatment at the Pain Management Clinic under the supervision of Dr. Harvey E. Mallory. (AR 202.) Dr. Mallory described that, at the first appointment, Young had limited range of motion in forward flexion and was tender to palpitation

4

in the lumbar spine. (*Id.*) For the first time in the medical records, Young's gait was noted, and Dr. Mallory indicated that it was normal. (*Id.*; *see also* AR 197 (normal gait on April 9, 2008), 255 (normal gait on May 12, 2008).) Dr. Mallory increased Young's dosage of gabapentin and ordered baclofen, Tylenol extended release, oxycodone, and Restoril. (AR 203.) A month later, nothing had changed aside from Young reporting worsening pain. (AR 200.)

Dr. Mallory decided to attempt a lumbar epidural steroid injection to ease Young's pain. (*Id.*) On April 17, 2008, Young received the epidural steroid injection. (AR 222-27.) A month later, he reported that he received no improvement in his pain from the injection and that it possibly exacerbated the pain. (AR 255.) Despite reporting that he was barely able to walk a week after the injection, he continued to work. (*Id.*) The physical exam in May included Young's first positive straight leg test. (*Id.*) The pain management physician explained to Young that injections were unlikely to help him and that the clinic could only work with him on his medication regimen to optimize his pain control. (*Id.*) At that point, he was also prescribed MS-Contin and Piroxicam. (*Id.*)

In June of 2008, Young returned to the clinic after missing an appointment two week earlier, and the pain management physician who examined him expressed concern about his medication use. (AR 253.) She reported:

> He is unclear how much of the oxycodone and MS Contin he has actually taken. He said that he had some extra pills in a bottle from another prescription and is unclear what these are. Sometimes he says they are Percocet; it is unclear how many he is taking, up to 6 a day. His story seems to change during the discussion.

(*Id.*) She refilled his prescriptions, but stressed to him the need to follow his opiate contract. (*Id.*) She was also the first physician to notice an antalgic gait. (*Id.*; *see also* AR 302 (antalgic gait on February 11, 2009), 300 (antalgic gait on March 25, 2009), 284 (mildly antalgic gait on June 18, 2009).)

Conservative treatment with medications continued for another year through the Pain Management Clinic. As of April 22, 2009, Young told Dr. Mallory that, now that he is steadily taking his medications, his "quality of life has improved significantly." (AR 297.) Though he was "exquisitely tender" to pressure in his lumbar spine, no problems with his gait or straight leg raises were noted. (*Id.*) Dr. Mallory advised Young to continue being compliant with his activities and to limit lifting, suggesting that the field of welding[3] might not be Young's best option for employment and that "perhaps he should consider something that requires less physical activity." (AR 298.) In May of 2009, a negative straight leg raise was noted, and the doctors decided to attempt a facet steroid injection again. (AR 294.) He received the injection on June 3, 2009 and reported that he got some pain relief because it "took some of the pressure off." (AR 284, 291.)

The UNM doctors prescribed physical therapy on several occasions in an effort to control Young's back pain; however, those efforts were unsuccessful because Young apparently chose not to participate and was eventually denied insurance coverage. On October 8, 2007, physical therapy was prescribed for the first time. (AR 214.) Young went to one intake appointment on November 14, 2007 (AR 211) and one physical therapy session on November 24, 2007 (AR 228-29). During the session, the physical therapist treated Young with deep soft tissue work. (AR 228.) He requested that Young receive ten more visits through January 30, 3008. (AR 229.) However, Young told the Family Practice Clinic that the massage treatment made him uncomfortable (AR 209), and he did not return for further therapy. Again in June of 2008, physical therapy was prescribed. (*See* AR 266.) Though he told his physician on June 26, 2008 that he was continuing with physical therapy (AR 253), he only attended one appointment on June 25, 2008 (AR 266). At that appointment, the

---

[3] Though Young's work history does not include welding, I presume that he was considering going into welding as a new field and discussing that plan with Dr. Mallory.

6

therapist recommended that he participate in a back to fitness class. (AR 266.) Young neither attended the class nor returned the therapist's call, and he was formally discharged from physical therapy on July 7, 2008. (*Id.*) Again on October 28, 2008, he was seen for an initial physical therapy evaluation, and he was to be seen once a week for six to eight weeks. (AR 320-21.) However, it appears that he was denied further visits by his insurance company because he had already gone to physical therapy for the same condition. (AR 318.)

Beginning in July of 2009, Young's doctors indicated that surgical intervention could be necessary to alleviate his pain. (AR 280.) Dr. Mallory spoke with Young and determined that he would benefit from a TruFUSE procedure. (*Id.*) Young agreed to undergo the procedure and the paperwork was completed at that time. (*Id.*) He was scheduled to have the procedure in late July or early August. (AR 281.) However, Young did not show up for the scheduled TruFUSE procedure. (AR 277.) On August 12, 2009, Young advised Dr. Mallory that "his significant other did not remember correctly some things that were said and she would not let him come in for the procedure." (*Id.*) They again thoroughly discussed the procedure and Young said "he was anxious to get it done if it would provide pain relief." (*Id.*) Dr. Mallory scheduled the procedure for September 9, 2009. (AR 277.) Again, Young failed to show up. (AR 28-30, 33-35.)

Young began to complain to his doctors about depression on January 14, 2009 (AR 306), and he was prescribed Zoloft as of February 11, 2009 (AR 302). There is no real discussion of depression in the medical records. In an undated disability report completed after July 16, 2008, Young indicated that new physical or mental limitations included "[v]ery depressing for me and I have anxiety." (AR 179.)

At some point, Dr. Mallory wrote two letters in reference to Young's impairment and his ability to work. Neither is dated. The one that seems to be most recent indicates that Dr. Mallory had

7

treated Young for one year. (AR 324.) The substance of the letter diagnoses Young with severe degenerative disk disease, which creates "debilitating pain in the lumbar spine" and "prevents his current employment." (*Id.*) Specifically, Dr. Mallory indicated that heavy lifting, bending and carrying heavy equipment on his back are contraindicated due to his condition. (*Id.*) The other letter states that Young has chronic back pain related to degenerative disk disease that he has attempted to treat with physical therapy, injections and medications "without success." (AR 272.) Dr. Mallory stated that his janitorial work involved much "heavy lifting, bending, stooping, and carrying of heavy objects" and opined that those activities "gradually brought his degenerative disk disease into a disabling reality." (*Id.*) However, Dr. Mallory did not indicate any functional restrictions. (*Id.*)

Dr. Mallory also completed a form for the U.S. Department of Labor on July 23, 2008, on which he indicated Young's diagnosis, that it had created "debilitating pain," that the condition commenced in 2004, and that Young was "presently incapacitated[.]" (AR 171.) Incapacity was defined on the form as "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom." (*Id.*) Dr. Mallory also stated that Young is unable to perform work of any kind. (*Id.*)

Other opinion evidence in the record includes work release forms from his primary care doctors. On October 8, 2007, Dr. Mohamad Khafaja stated that Young should refrain from carrying weights for at least a couple of months until he had undergone physiotherapy and been reevaluated for back pain. (AR 231.) A few days later, Young returned and requested that they provide him with a full work release because his employer would fire him otherwise. (AR 214.) On October 11, 2007, Dr. Khafaja provided a letter stating that Young could resume work with no restrictions. (AR 230.)

A physical RFC assessment was completed by SSA physician Janice Kando on May 27, 2008 and affirmed by Dr. N.D. Nickerson on October 14, 2008. (AR 240-47, 273.) Dr. Kando

8

reviewed the medical record and concluded that Young could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for six out of eight hours every day, and sit for six out of eight hours in a work day. (AR 241.) She described the supporting medical evidence. (AR 241-42.) She further found that he was limited to occasional performance of all postural limitations aside from balancing, which he could do frequently. (AR 242.) Because Dr. Nickerson deemed the additional medical evidence as of October of 2008 consistent with the prior assessment, he affirmed Dr. Kando's initial RFC assessment. (AR 273.)

Young reported his functional abilities to the SSA on a form completed on July 26, 2008. (AR 163-70.) He indicated that he spends most of his day sitting in a chair because of difficulty walking, though he does water plants and take care of animals. (AR 163-64.) He wrote that he can no longer lift, squat, stand for a long time, run, or work. (AR 164.) He also stated that he struggles to put on his pants and to lift his leg into the bath. (*Id.*) He indicated that his areas of limitation include lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and concentrating. (AR 168.) He is able to prepare food for himself and do chores once a week including dusting and laundry. (AR 165.) He is able to drive a car and to spend an hour or two at a time shopping in stores for food, clothing and household products. (AR 166.) However, he said that he must stop and rest every five minutes for five to ten minutes when walking. (AR 168.)

At the hearing before ALJ George Reyes on November 6, 2009, Young appeared with the assistance of counsel and provided testimony regarding his impairments and his functional abilities. (AR 23-47.) The ALJ noted that Young was limping and asked him about the limp; Young testified that he has always limped for about two years. (AR 27.) The ALJ asked Young to explain why he did not appear for the TruFUSE procedure that was scheduled by his doctors; he stated that his

9

doctors had told him different stories about the procedure, that he was scared because the procedure was new, that the doctors were rushing him into it, that "[i]t was just a misunderstanding" (AR 29), and that he did not think the procedure would help because the shots did not help. (AR 28-30, 33-35.) Young testified about his functional abilities on his alleged onset date and on the date of the hearing. On the alleged onset date, Young testified that he could walk about twenty feet before pain and fatigue forced him to stop, that he could stand less than ten minutes before pain or fatigue would cause him to quit standing, that he could sit ten minutes before pain or fatigue would force him to quit sitting, and that he could lift and carry ten pounds with both hands without hurting himself. (AR 41-43.) The only difference by the date of the hearing was that Young reported only being able to stand for under five minutes and only being able to sit for less than ten minutes. (AR 43-44.) He rated his general level of pain as a seven or eight on a ten point scale. (AR 45.)

## ALJ AND APPEALS COUNCIL DECISIONS

The ALJ denied Young's applications on February 26, 2010. (AR 7.) He determined that Young met the insured status requirements and had not engaged in substantial gainful activity since his amended alleged onset date. (AR 12.) He found that Young has a severe impairment of lumbar degenerative disk disease and a non-medically determinable impairment of depression (AR 12, 15.) The ALJ reviewed Young's treatment records dating from September of 2007 regarding his back pain, noting his symptoms, the outcomes of testing, the prescribed medications and other treatments and the doctors' impressions. (AR 12-15.) However, Young's degenerative disk disease did not meet or equal a listing because his examinations have not consistently demonstrated motor or sensory loss or positive straight-let raising. (AR 15.)

The ALJ then determined Young's functional abilities despite his limitations. He found that Young has the capacity to perform the full range of light and sedentary work, with occasional

10

performance of all postural maneuvers aside from balancing, which he can do frequently. (*Id.*)

To render this RFC decision, the ALJ first assessed Young's credibility. (AR 15-16.) He found that Young's degenerative disk disease could be expected to cause the symptoms alleged but that Young's statements regarding the severity and limiting effects of his impairment were "not credible to the extent they are inconsistent with the [RFC] . . . ." (AR 16.) The ALJ based this credibility assessment on several factors, including symptom magnification, history of narcotic-seeking behavior, non-compliance with treatment, good functioning when following medical instructions, and inconsistent reports of his ability to function. (AR 16-17.)

The ALJ then reviewed the opinion evidence in Young's case, specifically Dr. Mallory's letters and the Department of Labor form. (AR 17.) The ALJ found that Dr. Mallory's opinion that Young had been incapacitated from 2004 though July of 2008 was inconsistent with Young's actual ability since he performed substantial gainful activity throughout that time. (*Id.*) The ALJ further found that this called Dr. Mallory's other opinion into question. (*Id.*) Nonetheless, the ALJ gave significant weight to Dr. Mallory's opinion that Young could not perform his duties as a janitor because he judged that opinion consistent with the record as a whole. (AR 18.)

The ALJ determined that Young can not return to his past relevant work because it was performed at the medium to heavy exertional level. (*Id.*) Based on Young's age, education, work experience, and RFC, the ALJ concluded that Young could complete other work in the national economy. (*Id.*) Specifically, the ALJ relied on the Medical-Vocational Guidelines ("grids"), 20 C.F.R. pt. 404 subpt. P app. 2, because he found that Young could perform substantially all of the exertional demands at both the light and sedentary levels. (*Id.*) The grids directed the ALJ to find that Young was not disabled. (AR 19.)

Young requested that the Appeals Council review the ALJ's decision on March 19, 2010.

(AR 6.) The Appeals Council denied Young's request for review. (AR 1-3.) Thus, the ALJ's decision became the final decision of the Commissioner.

ANALYSIS

Young challenges two aspects of the ALJ's decision. First, he alleges that the ALJ's credibility determination is unsupported by substantial evidence and legally deficient. (Doc. 24 at 3-9.) Next, he contends that the ALJ committed legal error by relying on the grids to conclude that Young could perform work in the national economy. (Doc. 24 at 9-10.)

## I.      Credibility Determination

Young's first argument is that the ALJ erred in discounting the credibility of his subjective allegations, which led the ALJ to determine that his pain was not as severe as alleged. (Doc. 24 at 3-9.) "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990); *see also Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991) (upholding the ALJ's credibility determination because it was supported by substantial evidence even though the ALJ did not discuss all possible considerations). The ALJ is not required to conduct "a formalistic factor-by-factor recitation of the evidence." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). But he must give "specific reasons" for his findings, *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (citations and quotations omitted), that are "closely and affirmatively linked to substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)). Such findings enable the court to meaningfully review the evidence considered by the ALJ in judging a claimant's credibility. *Hardman*, 362 F.3d at 679 (citing *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001)).

When pain is alleged, the ALJ must follow three steps to determine whether the claimant's subjective allegations are credible. First, he must determine whether the claimant established a pain-producing impairment with objective medical evidence. *Branum v. Barnhart*, 385 F.3d 1268, 1273 (10th Cir. 2004) (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993)). Next, he must consider whether a loose nexus between the impairment and the subjective allegations of pain exists. *Id.* Finally, he must evaluate whether, based on all of the evidence, the pain is actually disabling. *Id.* This third step is significant because "disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988) (quoting *Brown v. Bowen*, 801 F.2d 361, 362–63 (10th Cir. 1986)).

To determine the credibility of the claimant's testimony regarding pain, the ALJ should consider factors like:

> [T]he levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Thompson*, 987 F.2d at 1489 (quoting *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991)).

Here, the ALJ concluded that Young had a pain producing impairment and that there was a loose nexus between the impairment and the allegation; however, he found that, based on the entirety of the record, the pain was not actually disabling. (AR 15-17.) The ALJ cited to several reasons for discounting Young's subjective allegations of disabling pain. First, he found that Young magnified his symptoms, specifically referencing Young's testimony that his limp dated back two years as compared to the medical records from February and April of 2008 and July of 2009. (AR

13

16-17.) As a second reason to doubt Young's credibility, the ALJ cited to his history of narcotic-seeking behavior and use of narcotics not prescribed to him prior to January 2009. (AR 17.) Third, the ALJ relied on Young's failure to comply with prescribed treatment. (*Id.*) Specifically, the ALJ found that Young failed to appear for a back to fitness class, other physical therapy appointments, and the scheduled back surgery. (*Id.*) Fourth, the ALJ described that Young's doctors found that he is able to function adequately when he complies with treatment recommendations, quoting a treatment note from April 2009. (*Id.*) Finally, the ALJ found that Young's function report was inconsistent with his report that his pain prevents him from performing activities of daily living. (*Id.*)

In evaluating the credibility of Young's allegations of pain, the ALJ considered the kinds of factors – consistency of testimony with medical evidence, effectiveness of treatment, failure to follow prescribed treatment, drug-seeking behavior, and daily activities – that have long been deemed appropriate considerations by the Tenth Circuit. *See, e.g.*, *Poppa v. Astrue*, 569 F.3d 1167, 1171-72, 1171 n.3 (10th Cir. 2009) (affirming credibility determination that included discussion of daily activities, pain and other symptoms, effectiveness of medications, measures that provide relief from symptoms, and drug-seeking behavior); *Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000) (holding that the ALJ may consider that an impairment is somewhat controlled by medication or that a claimant is not currently taking prescribed medications). Moreover, the ALJ considered these factors in conjunction; he did not rely on one factor to the exclusion of all others. *See Thompson*, 987 F.2d at 1490 (quoting *Frey v. Bowen*, 816 F.2d 508, 516 (10th Cir. 1987)) (prohibiting an ALJ from relying entirely on minimal daily activities as substantial evidence of non-credibility). Furthermore, as described in detail below, the ALJ closely and affirmatively linked his credibility

findings to specific evidence that is supported by the record.[4]

A.      *Symptom Magnification*

Young takes issue with the ALJ's finding that he exaggerated his limp. (Doc. 24 at 5-6.) Though Young cites to several medical records that document a limp, it appears that he has misunderstood the import of the ALJ's finding. The ALJ did not conclude that Young does not have a limp; rather, the ALJ concluded that Young exaggerated the duration and severity of his limp. (AR 16.) The ALJ fairly surmised that Young was inconsistent in displaying a limp to doctors and that his report that he had limped constantly for two years was belied by the medical records. (*Compare* AR 27, *with* AR 197, 202, 255.) The ALJ's finding that Young's testimony about his limp was inconsistent with the medical evidence is borne out by the record. *See Luttrell v. Astrue*, No. 10–5161, 2011 WL 6739432, at * 6 (10th Cir. Dec. 23, 2011) (unpublished) (citations omitted) ("The ALJ noted several discrepancies in Claimant's statements and behavior[.] . . . Claimant offers explanations for these apparent inconsistencies and insists they need not reflect adversely on her credibility, but it is not for us to re-weigh or to interpose our own judgment of the evidence in this way.")

B.      *Narcotic-Seeking Behavior*

Young next asserts that the ALJ unjustifiably found that he had engaged in narcotic-seeking behavior based solely on two records from 2007. (Doc. 24 at 6-7.) The ALJ mentioned this behavior

---

[4] Because the ALJ relied on several separate factors, even if he had erred in finding substantial evidence to support one, any error would be harmless and reversal would not be warranted. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Roybal v. Astrue*, 224 F. App'x 843, 848 (10th Cir. 2007) (unpublished) (holding that reversal is not justified where the ALJ committed one error in finding inconsistent testimony about activities but the other reasons for discounting credibility were supported by substantial evidence).

in passing in his credibility assessment, so he did not cite to the records that supported his finding. (AR 16.) However, there is medical evidence in the record, which was described by the ALJ, that supports a finding that Young's credibility was compromised by his drug-seeking behavior. Specifically, Young told doctors in September and October of 2007 that he was taking narcotics that were not prescribed to him (AR 12-13, 216, 219), he was taking more than his prescribed Percocet dosage in January of 2008 (AR 13-14, 206), and he ran out of medications and was unclear about what he was taking in June 2008 (AR 14, 253). This constitutes sufficient evidence in the record to support the ALJ's determination that Young's credibility was compromised by his narcotic-seeking behavior. *See Poppa*, 569 F.3d at 1171-72 (affirming ALJ's finding of narcotic-seeking behavior based on three instances of claimant increasing dose of medications without doctor permission and/or requesting post-dated prescriptions).

C.      *Functioning in April of 2009*

The ALJ cited to a treatment note dated April 22, 2009 as support for a finding that Young functions fairly well when compliant with his doctors' instructions. (AR 17.) Young argues that this finding is contradicted by substantial evidence, specifically the records after April of 2009.[5] (Doc. 24 at 7.) This argument, though, is a non-starter. Young fails to cite to any specific records that contradict the ALJ's finding that, when compliant with his doctor's instructions, he was better able to function. The only record cited is a treatment note from June 18, 2009. At that time, the doctor noted that his gait was only mildly antalgic and that he received moderate benefits from the facet

---

[5] Young asserts that the ALJ was required to evaluate "all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." (Doc. 24 at 7 (citing 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1)).) The cited regulation addresses the evaluation of mental, not physical, impairments. Furthermore, the cited regulation does not go to a credibility assessment but rather to the overall determination of a claimant's functional capacity.

injections. (AR 284.) At the appointment before that, in May of 2009, Young reported no significant changes and the doctor noted a negative straight leg raise. (AR 294.)

Moreover, the ALJ did not assume that Young's pain dissipated entirely when he was compliant with his doctors' instructions; instead, he found that Young had not followed prescribed treatment and that he showed some improvement on those occasions when he did follow the instructions of his physicians. This finding is not contradicted by substantial evidence.

D.    *Failure to Follow Prescribed Treatment*

Young next contests the ALJ's determination that his allegations of pain were not entirely credible due to his failure to follow prescribed treatment, though he focuses solely on his failure to go through with the TruFUSE procedure. (Doc. 24 at 8-9.) Young cites to *Thompson*, 987 F.2d 1482, which sets out four factors that an ALJ should consider prior to discrediting a claimant's allegations of pain due to his failure to follow prescribed treatment. (Doc. 24 at 8.) The Commissioner does not dispute that the ALJ did not thoroughly evaluate the factors. (Doc. 25 at 8.) Instead, he argues that the ALJ merely required to consider, not recite, the factors because the ALJ did not deny benefits on the basis of Young's failure to follow prescribed treatment. (*Id.*) I find that the Commissioner correctly states the applicable law.

"The failure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment." *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) (citing *Diaz*, 898 F.2d at 777). The Tenth Circuit has explained that an ALJ should consider "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse" before relying on the claimant's failure to follow the treatment as support for a determination of noncredibility. *Thompson*, 987 F.2d at 1490 (quoting *Frey*, 816 F.2d at 517).

However, the ALJ is only explicitly required to discuss the factors in his decision when he will deny benefits based on the claimant's failure to follow prescribed treatment. *See* 20 C.F.R. §§ 404.1530, 416.930 (permitting denial of benefits if prescribed treatment that could restore ability to work is not followed without good reason); *Qualls*, 206 F.3d at 1372 (citations omitted) (holding that, though the ALJ did not discuss the factors, he "properly considered what attempts plaintiff made to relieve his pain-including whether he took pain medication-in an effort to evaluate the veracity of plaintiff's contention that his pain was so severe as to be disabling."). This interpretation is further supported by the SSA's guidance on assessing credibility. SSR 96-7p, 1996 WL 374186. The SSA has stated that a claimant's attempts to seek medical treatment for pain and to follow that treatment once prescribed can lend support to allegations of severe pain. *Id.* at *7. On the other hand, an individual's failure to follow treatment as prescribed without good reason may render the individual's statements regarding the level of pain less credible. *Id.*

In Young's case, the ALJ discounted Young's credibility regarding his assertions of disabling pain in part due to his failure to participate in physical therapy and his failure to follow through with his scheduled TrueFUSE procedures. (AR 17.) The ALJ found that Young's reasons for failing to undertake the surgery were questionable. (*Id.*) He further cited to treatment records that stated that Young's quality of life was improved when he followed recommended treatment. (*Id.*) These findings demonstrate that the ALJ considered the factors and properly discounted Young's credibility because he had not made all attempts to relieve his pain that were prescribed by his doctors. *See Allen v. Apfel*, 216 F.3d 1086, 2000 WL 796081, at *3 (10th Cir. 2000) (table) (citations omitted). Furthermore, Young has pointed to nothing in the record to contradict the ALJ's finding that Young failed to avail himself of all treatment options that were prescribed, available, and did

not entail undue risk.[6]

E.     *Daily Activities*

Young contends that the ALJ erred by relying on his minimal daily activities to find that he did not suffer disabling pain. (Doc. 24 at 7-8.) While an ALJ is prohibited from relying on minimal daily activities to find that a claimant can engage in substantial gainful activity, *see Thompson*, 987 F.2d at 1490, the ALJ here did not use Young's daily activities as a basis to conclude that he could perform substantial gainful activity. Instead, the ALJ discounted Young's credibility because he provided internally inconsistent reports of his functional capacity. (AR 17.) An ALJ may consider inconsistencies in the evidence presented by the claimant in reaching a credibility determination.

The ALJ stated that Young reported at one point that his pain precluded him from performing activities of daily living but at another time admitted that he was able to care for his pets, do light household chores, do light gardening, drive, shop and prepare simple meals. (*Id.*) It is not clear from the ALJ's opinion when Young reported that his pain precludes him from performing daily living activities, but the records demonstrate that he has made such reports. Specifically, in a Disability Report made after March of 2008, Young stated, "I am not able to walk or get up out of bed or chair . . . ." (AR 154.) That report is clearly inconsistent with his report that he can perform various daily activities because he would not be able to care for his pets, dust, or shop if he was completely bed-ridden.

In conclusion, I find that the ALJ's credibility determination meets the applicable legal standards, is supported by specific evidence, and is not contradicted by substantial evidence;

---

[6] I find the article cited by Young's attorney unpersuasive. (Doc. 24 at 8.) The citation from the article references non-specific lumbar fusion and not the relatively new spinal procedure that Young's physicians recommended, and the fact remains that Young's treating physicians encouraged him to undergo the TruFUSE procedure without reservation and scheduled the procedure for him on two separate occasions.

therefore, it is entitled to deference and must be affirmed.

## II.   Reliance on Grids at Step Five

Young's second argument is that the ALJ committed legal error by applying the grids to determine that Young could perform other work existing in the national economy. (AR 9-10.) Young contends that his degenerative disk disease and associated pain are nonexertional impairments precluding reliance on the grids. (*Id.* at 9.) He argues that the ALJ ignored his pain throughout the step five analysis and thereby committed legal error requiring remand. (*Id.* at 10.) While this argument is not particularly well-formulated, the ALJ did find that Young was limited to occasional, rather than frequent, performance of all postural maneuvers aside from balancing. Despite that nonexertional limitation, the ALJ relied conclusively on the grids to find that Young was not disabled.

The grids should not be applied conclusively unless the claimant can perform the full range of work required of a particular exertional category on a daily basis. *Hargis*, 945 F.2d at 1490. Resort to the grids is particularly inappropriate when the claimant has nonexertional limitations. *Id.* When nonexertional limitations are present, the grids may not be applied mechanically but may serve only as a framework to aid in the determination of whether sufficient jobs remain within a claimant's RFC. *Huston*, 838 F.2d at 1131. But the presence of nonexertional limitations precludes reliance on the grids only to the extent that such impairments limit the range of jobs available to the claimant. *Ray v. Bowen*, 865 F.2d 222, 226 (10th Cir. 1989). If an ALJ finds that a nonexertional limitation has a negligible effect on the range of jobs available, he "must back such a finding of negligible effect with the evidence to substantiate it." *Talbot v. Heckler*, 814 F.2d 1456, 1465 (10th Cir. 1987).

The error in Young's argument lies in his assumption that pain is a nonexertional impairment

or limitation. The regulations and SSA policy interpretations make clear that pain is a symptom. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p, 1996 WL 374187, at *2. A symptom is something that may be produced by a medically determinable physical or mental impairment. SSR 96-4p at *2. The impairment and related symptom may then lead to limitations in an individual's ability to meet certain job demands. *Id.* The limitation may be exertional, nonexertional, or both, and it is the nature of the limitation resulting from the symptom that determines whether or not the grids can be applied conclusively. *Id.* However, the symptom in and of itself is neither exertional nor nonexertional. *Id.*

Nonetheless, Young's overall argument ultimately has merit. The ALJ determined that Young's impairment (degenerative disk disease) and related symptom (pain) led to exertional limitations including lifting no more than twenty pounds on occasion and ten pounds frequently as well as nonexertional limitations of occasional performance of all postural limitations except balancing, which was not limited. (AR 15.) At step five, the ALJ stated simply that Young could perform the full range of light and sedentary work and found that the grids directed a finding of not disabled. (AR 18-19.) He failed to mention the postural limitations at step five. Had the ALJ either not included nonexertional postural limitations in the RFC or found that the impact of those postural limitations had a negligible effect on the range of available jobs and substantiated that determination, the SSA would have been correct in asserting that the ALJ's reliance on the grids was permissible. (*See* Doc. 25 at 10.) The ALJ did not take either of these routes and thus committed legal error requiring remand.

Upon remand, the ALJ must either reconsider his RFC assessment or address the postural limitations in his step five finding. If the ALJ includes postural limitations and finds that the restrictions have a more than negligible impact on the available range of jobs, then testimony from a vocational expert will be necessary.

21

## CONCLUSION

Because the ALJ committed legal error at step five of the sequential evaluation process, I

GRANT Young's motion (Doc. 23), REVERSE the decision of the Commissioner, and REMAND

this case to the Agency for further proceedings consistent with this Order.

IT IS SO ORDERED.


_____
William P. Lynch
United States Magistrate Judge
*Presiding by Consent*

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.                22